EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Partido Nuevo Progresista En Humacao<br><br>Recurrido<br><br>v.<br><br>José Carrasquillo, Director de Finanzas del Municipio de Humacao<br><br>Peticionario | Certiorari<br><br>2005 TSPR 157<br><br>165 DPR _____ |

Número del Caso: CC-2005-0015

Fecha: 27 de octubre de 2005

Tribunal de Apelaciones:

Región Judicial de Humacao

Juez Ponente:

Hon. Ismael Colón Birriel

Abogado de la Parte Peticionaria:

Lcdo. Israel Delgado Ramos

Abogado de la Parte Recurrida:

Lcdo. Carlos J. Correa Ramos

Materia: Injunction Preliminar; Injunction Permanente

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Nuevo Progresista
en Humacao

     Recurrido

        v.                        CC-2005-15       Certiorari

José Carrasquillo, Director
de Finanzas del Municipio de
Humacao

     Peticionario

Opinión del Tribunal emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON

San Juan, Puerto Rico a 27 de octubre de 2005.

Nos corresponde resolver si una demanda instada contra el Alcalde del Municipio de Humacao solicitando que cesara de publicar ciertos anuncios y de colocar varios letreros se ha tornado académica debido a la remoción de dichos letreros y al comienzo del período de veda electoral.

I.

En diciembre de 2002, el Partido Nuevo Progresista de Humacao (en adelante PNP de Humacao) presentó ante el Tribunal de Primera Instancia una petición de *injunction* preliminar y permanente

contra el Municipio de Humacao (en adelante Municipio), su alcalde, Hon. Marcelo Trujillo Panisse (en adelante, Alcalde), y su director de finanzas, el señor José Carrasquillo Jiménez.

En su demanda, el PNP de Humacao alegó, en síntesis, que el Alcalde utilizó fondos públicos para publicar su retrato en anuncios del Municipio de Humacao en contravención a la Ley Núm. 52 de 6 de agosto de 1994.[1] Adujo, además, que empleados municipales instalaron en ciertas carreteras dos letreros gigantescos con la foto del Alcalde y un mensaje de felicitación de parte de la administración municipal. Por último, solicitó que se ordenara al Municipio que desistiera de publicar dichos anuncios y que removiera los referidos letreros de la carretera. Alegaban que los mencionados anuncios y letreros tenían el efecto de coaccionar el libre pensamiento del pueblo y constituían un mal manejo de fondos públicos en contravención del Artículo 6, sección 9 de la Constitución del Estado Libre Asociado de Puerto Rico y al axioma de igualdad en materia electoral que permea todo nuestro ordenamiento constitucional.

El Municipio removió los letreros justo después de la presentación de la demanda. Así las cosas, el foro de instancia inicialmente denegó ambas peticiones de *injunction* por entender que la referente a los rótulos era improcedente pues ya se habían removido, y la

---

[1] Dicha ley regula el contenido que deben tener los anuncios publicados por las agencias gubernamentales.

concerniente a los anuncios no procedía ya que no se aportó prueba de que se hubieran pagado con fondos públicos. No obstante, el foro primario reconsideró dicha decisión y reinstaló el caso para considerar exclusivamente si procedía emitir el *injunction* permanente ordenando al Municipio que cesara de publicar los anuncios.[2]

Luego de varios incidentes procesales, en el 2004 el Tribunal de Primera Instancia dictó sentencia desestimando la demanda por entender que se había tornado académica. Resolvió que, al entrar en vigor la veda electoral el 1º de enero de 2004, de conformidad con el Artículo 8.001 de la Ley Electoral, 16 L.P.R.A. 3351, le compete exclusivamente a la Comisión Estatal de Elecciones la facultad de determinar qué anuncios gubernamentales pueden publicarse y cuáles no pueden publicarse por carecer de un fin público legítimo.

El PNP de Humacao recurrió de dicha determinación ante el Tribunal de Apelaciones. Alegó, en síntesis, que el pleito no debía desestimarse por académico toda vez que la controversia era susceptible de repetirse ya que los anuncios podían volver a publicarse y pagarse nuevamente con fondos públicos. El foro apelativo acogió los planteamientos del PNP de Humacao y revocó al foro de instancia. Resolvió que la controversia era capaz de

---

[2] Sin embargo, el foro de instancia denegó la petición de *injunction* preliminar.

repetirse aunque resultara electo un alcalde distinto al incumbente.

Inconforme, el Municipio acude ante nos señalando que incidió el Tribunal de Apelaciones al concluir que la controversia no se había tornado académica. Emitimos una Orden para Mostrar Causa por la cual no debíamos revocar al foro apelativo. Luego de examinar las comparecencias de las partes, procedemos a resolver.

II.

A.

Nuestro ordenamiento contiene una serie de requisitos, de origen constitucional o de creación judicial, que los tribunales deben observar antes de pronunciarse sobre los méritos de una controversia. Dichos requisitos suelen agruparse bajo el tema general de la "justiciabilidad". *Véase*, Raúl Serrano Geyls, *I Derecho Constitucional de Estados Unidos y Puerto* Rico, a las págs. 97-100 (Colegio de Abogados, 1986) y Erwin Chemerinsky, *Constitutional Law Principles and Policies,* a las págs. 49-50 (Aspen, 2ª ed., 2002). Se ha reconocido que un caso no es justiciable cuando las partes no tienen legitimación activa, cuando un asunto carece de madurez, cuando la pregunta ante el tribunal es una cuestión política, y cuando un caso se ha tornado académico. Noriega v. Hernández Colón, 135 D.P.R. 406, a las págs. 421-422 (1994).

Por mucho tiempo se ha debatido si las doctrinas de justiciabilidad tienen rango constitucional o si meramente constituyen reglas prudenciales de auto limitación judicial, *Véase* Erwin Chemerinsky, *A Unified Approach to Justiciability*, 22 Conn. L. Rev. 677, a las págs. 691-694 y José Julián Álvarez, *La Protección de los Derechos Humanos en Puerto Rico,* 57 Rev. Jur. U.P.R. 133, 167 (1988). Independientemente de ello, en Puerto Rico este Tribunal, como mecanismo para fomentar que la intervención judicial ocurra en el momento más oportuno, siempre ha reconocido que en casos como el de autos lo primero que hay que determinar es si la controversia es justiciable.

A tenor con lo antes expuesto, la cuestión de umbral en este caso es si la controversia que originó este recurso se tornó académica debido a la remoción de los letreros y a la entrada en vigor de la veda electoral.

B.

Como norma general, un caso debe desestimarse por académico cuando los hechos o el derecho aplicable han variado de tal forma que ya no existe una controversia actual entre partes adversas. <u>Comisión de la mujer v. Secretario de Justicia</u>, 109 D.P.R. 715 (1980), Chemerinsky, *supra*, a la pág. 112. En esencia, la academicidad no es otra cosa que la "doctrina de la acción legitimada enmarcada en el tiempo: El interés personal requerido debe existir al comienzo del litigio

(*standing*) y debe continuar durante toda la duración del mismo (*academicidad*)". Henry P. Monaghan, *Constitutional Adjudication: The Who and When,* 82 Yale L. J. 1363, a la pág. 1384 (1973) (traducción nuestra). *Véase además*, U.S. Parole Commission v. Geraghty, 445 U.S. 388, a la pág. 397.

El propósito de la doctrina es evitar el uso inadecuado de recursos judiciales y obviar precedentes innecesarios. Empresas Puertorriqueñas de Desarrollo, Inc. v. Hermandad Independiente de Empleados Telefónicos, 150 D.P.R. 924 (2000). Por otro lado, se ha señalado que, en ocasiones, la desestimación de un caso por académico puede tener un efecto nocivo ya que ello "puede causar que la misma pregunta se litigue en muchos otros tribunales hasta que sea finalmente resuelta por el Tribunal Supremo". Chemerinsky, *supra*, nota 12, a la pág. 113. (traducción nuestra). *Véase también* Gene R. Nichol, Jr., *Moot Cases, Chief Justice Rehnquist and the Supreme Court*, 22 Conn. L. Rev. 703 (1990). Con el fin de evitar esa relitigación innecesaria, la jurisprudencia ha desarrollado cuatro excepciones a la doctrina de la academicidad, a saber: (1) cuando se presenta una controversia recurrente y capaz de evadir revisión judicial, (2) cuando la situación de hechos ha sido modificada por el demandado pero no tiene visos de permanencia, (3) cuando la controversia se ha tornado académica para el representante de una clase pero no para

otros miembros de la clase, (4) y cuando persisten consecuencias colaterales que no se han tornado académicas. *Véase*, *en general,* John Nowak & Ronald Rotunda, Constitutional Law, a las págs. 70-76.

C.

Para resolver el caso de autos es necesario aclarar el significado y alcance de la excepción conocida como "cuestión recurrente capaz de evadir revisión judicial". La doctrina de "cuestión recurrente" permite que, excepcionalmente, se revise en sus méritos una controversia técnicamente académica dependiendo del saldo que arroje el examen de los siguientes tres criterios: (1) probabilidad de la recurrencia, (2) identidad o no de las partes involucradas en el posible pleito recurrente futuro, y (3) probabilidad de que la controversia evada revisión judicial. Cruz Negrón v. Administración de Corrección, res. 28 de marzo de 2005, 2005 TSPR 34.

En cuanto al primer criterio, se requiere que exista una "probabilidad razonable" de que la controversia pueda repetirse. De otra parte, en cuanto al tercero, se requiere que el daño sea "inherentemente de tan corta duración que sea probable que la controversia siempre se torne académica antes de que la litigación se complete". Chemerinsky, *supra*, nota 12, a las págs. 117-118. (traducción nuestra)

Por otro lado, hemos reconocido que no debemos desestimar el caso por académico si la controversia es

susceptible de repetirse entre las mismas partes. <u>San Antonio Maritime v. Puerto Rican Cement Co.</u>, 2001 T.S.P.R. 16. Por tanto, resulta relevante en el análisis no sólo la susceptibilidad de repetición, sino también la identidad de las partes. Lo primero tiene el propósito de promover la economía procesal, mientras que lo segundo tiene el fin de fomentar la abstención judicial en situaciones en que los litigantes pudieron haber perdido el incentivo para continuar litigando vigorosamente el caso. Por tal razón, como regla general, debe existir tanto la capacidad de que se repita la controversia como la posibilidad de que la recurrencia sea entre las mismas partes.

No obstante, en casos que presentan cuestiones constitucionales revestidas de un alto interés público, hemos reiterado que podemos entrar en los méritos de la controversia a pesar de que la probabilidad de repetición sea entre partes distintas. <u>Asociación de Periodistas v. González</u>, 127 D.P.R. 704 (1991), a la pág. 721. Ello se debe a que la gran importancia de los intereses en pugna en casos como éstos nos lleva a atender la controversia lo antes posible para cumplir con lo que el Profesor Owen Fiss ha llamado la tarea ineludible de los tribunales de "imprimirle un significado claro y concreto a nuestros valores constitucionales". Owen M. Fiss, *The Supreme Court, 1978 Term- Foreword: The Forms of Justice*, 93 Harvard L. Rev. 1, (1979).

De ahí que, en casos en que no existe identidad de partes, sólo hemos ejercido nuestra facultad para entrar a los méritos de un caso cuando se nos ha presentado una controversia en la que está en juego un valor constitucional de la más alta jerarquía. Así, por ejemplo, en Empresas Puertorriqueñas, *supra*, rechazamos el planteamiento de academicidad para poder expresarnos sobre los contornos del derecho fundamental a **la libertad de expresión**. En Asociación de Periodistas, *supra*, procedimos de la misma manera, pero esta vez con la intención de dilucidar el alcance del derecho a **la libertad de prensa**. De igual forma, en Com. para los Asuntos de la Mujer v. Secretario de Justicia, 109 D.P.R. 715 (1980), decidimos no abstenernos de ejercer nuestra facultad adjudicativa para así poder hacer ciertos pronunciamientos importantes sobre **la igual protección de las leyes**. Similarmente, el Tribunal Supremo Federal en Roe v. Wade, 410 U.S. 113 (1973), entró a los méritos de una controversia técnicamente académica para delimitar el ámbito de aplicación del **derecho a la intimidad**.

A la luz de esta normativa, pasemos a considerar el caso ante nos.

III.

El Municipio alega que erró el foro apelativo al ordenar que se continuara con los procedimientos en el caso de autos. Aduce, en síntesis, que el pleito debe desestimarse ya que la remoción de los letreros y el

inicio del período de veda electoral han causado que el caso se torne académico. Le asiste la razón. Veamos.

El PNP de Humacao solicitó al foro de instancia que ordenara al Municipio, mediante *injunction* preliminar y permanente, a remover unos letreros y dejar de publicar ciertos anuncios. Sin embargo, el Municipio removió los referidos letreros antes de adjudicarse la controversia en sus méritos. Además, mientras todavía estaba pendiente el caso, entró en vigor la veda electoral que le confiere autoridad exclusiva a la Comisión Estatal de Elecciones para pasar juicio sobre la legalidad de anuncios publicados por agencias gubernamentales. Resulta claro que dichos cambios fácticos (remoción de letreros) y normativos (entrada en vigor de la veda electoral) han provocado que "no exista una controversia actual entre partes adversas". Comisión de la mujer, *supra*.

El PNP de Humacao alega que la controversia de autos plantea un "asunto recurrente capaz de evadir revisión judicial". No le asiste la razón.

Por un lado, después de examinar detenidamente el expediente, no hemos encontrado prueba que nos convenza de que existe una probabilidad razonable, no especulativa, de que el Alcalde vuelva a colocar los letreros o a publicar anuncios similares. Lo mismo se puede decir sobre la probabilidad de que, si recurriera la controversia, la misma nuevamente evada revisión judicial.

También resulta especulativa la posibilidad de que la controversia se repita entre las mismas partes. No sabemos si, en caso de publicarse anuncios similares a los impugnados o colocarse otros letreros, el presente Alcalde todavía estará fungiendo como tal.

Por último, en el caso de autos no están en juego valores constitucionales de la más alta jerarquía que ameriten que, a pesar de que no existe una probabilidad razonable de que recurra la controversia entre las mismas partes, ejerzamos nuestra facultad adjudicativa para entrar a los méritos del pleito. Ello porque el PNP de Humacao se limita, en esencia, a expresar que la actuación del Alcalde viola el axioma de igualdad electoral. Dicho axioma, aunque ciertamente representa un principio importante dentro de nuestro ordenamiento jurídico, no constituye un "valor constitucional de la más alta jerarquía" equiparable en rango a derechos fundamentales como la libertad de expresión (Empresas Puertorriqueñas, *supra*), la libertad de prensa (Asociación de Periodistas, supra, o el derecho a la intimidad (Roe, *supra*). A estos efectos, declinamos entrar a los méritos de la controversia para dilucidar el alcance de dicho axioma en situaciones como la de autos. La revisión judicial de acciones como las tomadas por el Alcalde debe esperar, pues, a un momento más oportuno.

IV.

Por todo lo antes expuesto, se expide el auto de *certiorari*, se revoca la sentencia del Tribunal de Apelaciones, y se ordena la desestimación del caso por tratarse de un asunto académico.

Se dictará la Sentencia correspondiente.


                              FEDERICO HERNÁNDEZ DENTON
                                    Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Nuevo Progresista
en Humacao

    Recurrido

       v.                    CC-2005-15      Certiorari

José Carrasquillo, Director
de Finanzas del Municipio de
Humacao

    Peticionario

SENTENCIA

San Juan, Puerto Rico a 27 de octubre de 2005.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se expide el auto de *certiorari*, se revoca la sentencia del Tribunal de Apelaciones, y se ordena la desestimación del caso por tratarse de un asunto académico.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rebollo López disiente sin Opinión escrita. El Juez Asociado señor Rivera Pérez emitió Opinión Disidente.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Nuevo Progresista en Humacao

    Demandante Recurrido

       v.              CC-2005-15

José Carrasquillo, Director de Finanzas del Municipio de Humacao

    Demandado Peticionario

Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 27 de octubre de 2005.

Muy respetuosamente **disiento** del curso de acción tomada por la Mayoría por la mismas razones que expusimos en nuestra Opinión Disidente en el caso **P.N.P. v. Gobernadora**, **res. el 21 de junio de 2004, 162 D.P.R.___ (2004), 2004 J.T.S. 100, 2004 T.S.P.R. 105.** Concluimos que el resultado que formula la Mayoría en este caso es **contrario e inconsistente** con lo actuado y los pronunciamientos realizados por este Tribunal en **Emp. Pur. Des., Inc. v. H.I.E.Tel., 150 D.P.R. 924 (2000), P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995) y P.P.D. v. Gobernador II, 139 D.P.R. 984 (1996).** Veamos.

I

Hemos expresado en forma reiterada que al evaluar la procedencia de un *injunction* preliminar examinaremos los criterios siguientes: (1) la naturaleza de los daños que puedan ocasionarse a las partes de concederse o denegarse el injunction, (2)**la irreparabilidad del daño o la existencia de un remedio adecuado en ley**, (3) la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo; (4) **la probabilidad de que la causa se torne académica de no concederse el injunction y, sobre todo**, (5) el posible impacto sobre el interés público del remedio que se solicita.[3]

El propósito fundamental del injunction preliminar surge de la razón de ser del cuarto criterio a ser considerado para conceder el remedio solicitado. Este es, mantener el status quo hasta que se celebre el juicio en sus méritos para que así no se produzca una situación que convierta en académica la sentencia que finalmente se dicte al atender la petición de injunction permanente, o se le ocasionen daños de mayor consideración al peticionario mientras perdura el litigio.[4] No obstante,

---

[3] **Misión Ind. P.R. v. J. P. y A.A.A.**, 142 D.P.R. 656 (1997); **Mun. de Ponce v. Gobernador**, 136 D.P.R. 776 (1994); **García v. World Wide Entmt. Co.**, 132 D.P.R. 378 (1992); **Cobos Liccia v. DeJean Packing Co., Inc.** 124 D.P.R. 896 (1989), **Systema de P.R. , Inc. v. Interface Int'l**. 123 D.P.R. 379 (1989).

[4] **Misión Ind. P.R. v. J.P y A.A.A.**, *supra*.

el criterio en torno a la academicidad de tal causa de acción está, además, estrechamente relacionado con el segundo criterio, la irreparabilidad de los daños o la existencia de un remedio adecuado en ley.[5]

Los Tribunales pierden su jurisdicción sobre un asunto por academicidad cuando ocurren cambios durante el trámite judicial de un **caso y controversia** que hacen que este pierda su actualidad. No obstante, los cambios fácticos o judiciales a que hace referencia la jurisprudencia no pueden comprender bajo ninguna circunstancia posible la inacción de un tribunal y su falta de diligencia en atender un reclamo a nivel primario sobre **cese y desista**.

¿Se convirtió el **caso y controversia** pendiente ante el Tribunal de Primera Instancia en académico y perdió su actualidad por transcurrir el período pre eleccionario el 31 de diciembre de 2003? Contestamos dicha interrogante en la negativa. Este es un asunto que es **recurrente** y es susceptible **de volver a ocurrir**. De la única forma que este asunto evade nuestra revisión judicial, cuando es traído y litigado a tiempo ante el Tribunal de Primera Instancia y no surgen circunstancias exógenas que desvanezcan la controversia, es cuando la Rama Judicial no actúa. El **caso y controversia** resuelto en **P.P.D. v. Gobernador I,** *supra* no había sido atendido antes, a pesar de que había imperado tal conducta por previas administraciones de gobierno. El anuncio impugnado ya no

---

[5] **Id.; Mun. de Ponce v. Gobernador** ; *supra*.

se estaba publicando. No obstante, este Tribunal entendió que ese **caso y controversia** no era académico. El **caso y controversia** resuelto en **Emp. Pur. Des., Inc. v. H.I.E.TEL.**, *supra,* fue traído a tiempo a la Rama Judicial y resuelto con diligencia y premura por el Tribunal de Primera Instancia y el entonces Tribunal de Circuito de Apelaciones. La expresión concertada de la Unión en el centro comercial ya había terminado y la compañía telefónica ya no era arrendataria de la empresa dueña del mismo cuando la controversia llegó a este Tribunal para disposición final. No obstante, esta Curia entendió que dicho **caso y controversia** no era académico, revocando al Tribunal de Primera Instancia y al entonces Tribunal de Circuito de Apelaciones que habían resuelto lo contrario. A pesar de que el asunto de autos refleja la **expectativa razonable** y **la probabilidad demostrada** de que la misma controversia recurrirá en el futuro este Tribunal concluye que este **caso y controversia** es académico. No compartimos tal óptica.

II

La Sección 2 del Artículo II de la Constitución de Puerto Rico[6] dispone que las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal igual, directo y secreto y protegerán al

---

[6] Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed., 1999, pág. 262.

ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral. Dicha disposición constitucional consagra el principio básico de que el poder político emana del consentimiento y de la voluntad popular para imponer al Gobierno una responsabilidad dual: la de abstenerse de interferir con el ejercicio del sufragio universal igual, directo y secreto y la de proteger al ciudadano contra toda coacción en el ejercicio de tal prerrogativa electoral. El elector es acreedor a que su voto sea protegido por el Estado de distintas formas y con distinto vigor en una multiplicidad de situaciones.[7]

En la medida que se subvenciona una campaña político partidista con fondos públicos se le permite una ventaja al partido político de gobierno sobre los demás, lo cual atenta contra el axioma de igualdad electoral y socava los pilares del esquema electoral, que garantiza la igualdad económica entre los partidos políticos, sin limitarlo al período eleccionario. Esto afecta detrimentalmente el derecho de los electores a ejercer su voto libre de cualquier coacción toda vez que estos son componentes esenciales de los partidos políticos y por ende son colocados en la misma desventaja económica que su partido político, frente al que subvencionó parte de su campaña política en el período pre electoral con los fondos de todo el Pueblo, incluso los de esos electores

_____

[7] P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995).

pertenecientes a un partido político de oposición al gubernamental.[8]

Hemos reconocido que la expresión del Gobierno de naturaleza educativa e informativa es indispensable para que el pueblo pueda juzgar su labor y exigir remedio a los agravios gubernamentales.[9] Nuestra jurisprudencia refleja la tendencia seguida a favor de la divulgación de información pública, al punto de impartirle una dimensión amplia y robusta a la libertad de expresión consagrada en nuestra Carta de Derechos.[10]

Hemos expresado en forma reiterada que existe una estrecha relación entre el derecho a libre expresión y la libertad de información. Sin conocimiento de hechos no se puede juzgar. Tampoco se pueden exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales a través del proceso de las urnas cada cuatro (4) años.[11] No obstante, los derechos contenidos en la Carta de Derechos[12] le asisten a los individuos frente al

---

[8] Íd.

[9] Id.; Romero Barceló v. Hernández Agosto, 115 D.P.R. 368, 381 (1984); Santiago v. Bobb y El Mundo, Inc. 117 D.P.R. 153, 158 (1986).

[10] P.P.D. v. Gobernador I, *supra*; Noriega v. Gobernador, 130 D.P.R. 919 (1992); Noriega v. Gobernador, 122 D.P.R. 650 (1988); López Vives v. Policía de P.R., 118 D.P.R. 219 (1987) y Soto v. Srio. de Justicia, 112 D.P.R. 477, 485 (1982).

[11] P.P.D. v. Gobernador I, *supra*; Santiago v. Bobb y El Mundo, Inc., *supra* y Soto v. Srio de Justicia, *supra*.

[12] Art. II, Const. E.L.A., L.P.R.A., Tomo 1, ed., 1999, págs. 257-364.

Estado. Esos derechos no pueden extenderse a las expresiones del Gobierno porque los derechos civiles y políticos están formulados en términos de lo que el Estado no puede hacer con relación a la expresión de los individuos y no a la inversa. El Gobierno no tiene un derecho constitucional protegido a la libre expresión.[13]

El proceso decisional puertorriqueño responde en su realidad al postulado de igualdad inmerso en la Constitución de Puerto Rico el cual persigue lograr una igualdad y paridad económica entre los partidos políticos para divulgación de ideas y de mensajes en el país. De ello resulta que exista un amplio poder para la limitación de la propaganda gubernamental.[14]

La Sección 9 del Artículo VI de la Constitución de Puerto Rico[15], prescribe sobre la disposición por el Gobierno de los fondos públicos. Sólo pueden ser usados para un **fin público** y para el sostenimiento y funcionamiento de las instituciones del Estado, por autoridad de ley. La formulación por la Rama Ejecutiva o la Legislativa sobre lo que es un **fin público** es revisable por la Rama Judicial. No obstante, a la luz del sistema de separación de poderes, los tribunales deben actuar con prudencia y deferencia a la voluntad legislativa, siempre

---

[13] P.P.D. v. Gobernador I, *supra*.

[14] Íd.

[15] Art. VI, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1, ed., 1999, pág. 410.

que ella esté enmarcada dentro del esquema constitucional.[16]

El concepto **fin público** no es estático, pero si está ligado al bienestar general que tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica, a los problemas peculiares que éstas crean y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad compleja. Los objetivos que están contenidos en un **fin público** deben redundar en beneficio de la salud, la seguridad, la moral y el bienestar general de la ciudadanía. Los criterios para determinar lo que es un **fin público** se reducen a que contemple un beneficio público o que estén destinados a una actividad de carácter pública o semipública. Si la actividad que ha de ser costeada con fondos públicos promueve los intereses y objetivos de la entidad gubernamental, en consonancia con la política pública establecida sobre el particular, es evidente el **fin público** y el carácter legítimo de dicha erogación. Una vez se determina que existe un **fin público** en relación a la erogación de fondos por una entidad gubernamental, el hecho de que surja un beneficio incidental en favor de personas particulares no desvirtúa el **fin público** a que va dirigida la actividad gubernamental.[17]

---

[16] Íd.

[17] Íd.

El Gobierno de turno no puede utilizar los fondos públicos para beneficio del partido político en el poder. En la medida en que los fondos públicos se utilicen para propaganda político partidista para beneficio del partido político de gobierno se está afectando detrimentalmente el derecho de los electores de los demás partidos políticos. No se permite el uso político partidista de los fondos públicos. Tampoco es permitido al partido político de gobierno o candidato a puesto electivo de esa colectividad a que obtenga una ventaja económica a expensas del erario público. La verdadera esencia de un gobierno libre consiste en considerar los puestos públicos como un fideicomiso, encomendado para el bien del país y no para el beneficio de determinado partido político o grupo de individuos o electores.[18]

La utilización de fotografías de un gobernante con lemas políticos, no constituyen el beneficio incidental que podría obtener el partido político en el poder cuando divulgue anuncios aún cuando su contenido rinda un **fin público**. Esta prohibido manipular anuncios legítimos para obtener una ventaja política. Está vedado incluir en anuncios legítimos mensajes políticos, fotografías del gobernante, junto a lemas o colores que son distintivos del partido político en el poder para influenciar la opinión pública a su favor.

---

[18] Íd.

Cualquier ventaja que tenga el partido político de gobierno mediante la utilización de los fondos públicos, constituye una desigualdad, por lo que está proscrita. No hay espacio en este asunto para distinciones de grado. Si el desembolso de esos fondos que pertenecen a todo el pueblo adelanta, de cualquier manera, los intereses del sector político en el poder, ello constituye una ventaja sobre los otros sectores públicos, sea ésta grande o pequeña. Lo ilícito de tal ventaja no depende de su dimensión, sino de su ínsita inequidad. Todas están prohibidas porque inherentemente aparejan la desigualdad.

A tenor con el Art. VI, Sec. 9 de la Constitución de Puerto Rico, *supra*, no es válido ni permisible el uso de fondos públicos para campañas publicitarias o de propaganda, realizadas por el Gobierno de carácter político partidista ya sea clara, directa, indirecta, sutil, disimulada, sofisticada o esté entremezclada con actividades informativas y legítimas.


III

La justicia debe ser inmaculada no sólo en su realidad interior sino también en su apariencia externa.[19] Sobre este particular es de vital importancia la **consistencia**. Ser **consistentes** nos brinda tranquilidad de conciencia. La **inconsistencia** puede resultar en la injusticia.

---

[19] In re Rodríguez Torres, 104 D.P.R. 758, 766 (1926).

Debemos siempre tratar de utilizar **la misma vara de medir**.[20] De otra forma, existe el peligro, en un caso como el presente, de colocar o tratar a electores pertenecientes a sectores políticos distintos frente a actuaciones iguales o similares del Gobierno de forma injusta y, además, violatoria a sus derechos a la igual protección de las leyes y a un debido proceso de ley protegidos por la Constitución de Puerto Rico y la Constitución de Estados Unidos.

Es correcto que la **consistencia** en nuestras decisiones no es una garantía absoluta de la corrección de las mismas. No obstante, no hay duda que esta es de gran importancia. Ser **consistentes** le imprime estabilidad, confiabilidad y credibilidad a nuestro sistema de justicia y mas importante aún, en casos como el presente, le imprime vivencia a nuestra democracia constitucional.

IV

Por los fundamentos antes expuestos respetuosamente **DISIENTO** del curso de acción de este Tribunal. Expediríamos el recurso y confirmaríamos la sentencia

---

[20] <u>García Colón v De Jesús López</u>, 124 D.P.R. 708, 714 (1989), expresiones particulares del Juez Asociado señor Rebollo López.

recurrida.  Devolveríamos este caso al Tribunal de Primera Instancia para la continuación de los procedimientos a tenor con lo aquí pautado.


                              Efraín E. Rivera Pérez
                                 Juez Asociado